**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**THE WINFIELD GROUP, INC.,**

            **Plaintiff,**            **1:10-cv-1541
                                              (GLS/CFH)**

      v.

**THE ERIE INSURANCE GROUP,**

            **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:**<br>Office of James B. Tuttle<br>10 Century Hill Drive, Suite 4<br>Latham, NY 12110 | JAMES B. TUTTLE, ESQ. |
| **FOR THE DEFENDANT:**<br>Bond, Schoeneck Law Firm<br>111 Washington Avenue<br>Albany, NY 12210-2280 | ARTHUR J. SIEGEL, ESQ. |

**Gary L. Sharpe
Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff The Winfield Group, Inc. commenced this diversity action against defendant The Erie Insurance Group pursuant to 28 U.S.C. § 1332, alleging claims of conversion, interference with business relationships, and a violation of N.Y. Gen. Bus. Law § 349. (*See* Compl., Dkt. No. 1.)

Pending before the court are Erie's motion for summary judgment and Winfield's cross motion for partial summary judgment as to liability. (*See* Dkt. Nos. 17, 21.) For the following reasons, Erie's motion is granted and Winfield's cross motion is denied.

## II. Background

### A. Facts[1]

On May 17, 2007, Winfield, an insurance agency authorized to write insurance in New York, entered into an asset purchase agreement (APA) with Farley Insurance Agency, Inc., an insurance agency with offices in the Town of Clifton Park, New York. (*See* Dkt. No. 17, Attach. 2 at 13; Def.'s Statement of Material Facts (SMF) ¶¶ 1, 3, Dkt. No. 17, Attach. 26.) Pursuant to the APA, Farley agreed to sell, among other things, its expirations—the records or copies of an insurance agency's policies containing "the date of the policy, name of the insured, date of expiration, amount of insurance, premiums, property covered, and terms of insurance," *Richard T. Blake & Assocs. v. Aetna Cas. & Sur. Co.*, 255 A.D.2d 569, 570 (2d Dep't 1998)—to Winfield. (*See* Dkt. No. 17, Attach. 2 at 13.) A large percentage of policies serviced by Farley were Erie policies,

---

[1] Unless otherwise noted, the facts are undisputed.

and Winfield's intention in buying out Farley was to "expand [its] personal line insurance, build up volume, and acquire the right to offer and service insurance from other companies not previously represented by [it], including, potentially, Erie." (Def.'s SMF ¶¶ 5-6.)  John Tomassi, Winfield's president, was aware at the time the APA was executed, however, that Erie may decline to appoint Winfield as its agent and that Erie was not obligated to do so, even on a temporary basis.  (*See id.* ¶¶ 4, 10-11.)  Nonetheless, Tomassi expected to retain no less than eighty to eight-five percent of the policyholders by selling them non-Erie policies; he also believed that whether or not Winfield was named an Erie agent, it would continue to service the Erie policies until the end of their term and any authorized extensions.  (*See* Pl.'s SMF ¶¶ 11, 13-14, Dkt. No. 21, Attach. 17.)

Within days after execution of the APA, Tomassi contacted James Nolan, district sales manager for Erie, and discussed with him the possibility of Winfield being appointed as an Erie agent.  (*See* Def.'s SMF ¶¶ 19-21.)  Nolan eventually advised Tomassi that Erie was not interested in appointing Winfield as a permanent agent.  (*See id.* ¶ 22.)  On June 26, 2007, however, Erie appointed Winfield as a temporary agent, which was memorialized in a written temporary agency agreement (TAA).  (*See id.*

3

¶ 27.)  The TAA specifically required termination of the temporary agency "very shortly after" it began, and Erie was required to send out notice of termination to Winfield "within no more than one (1) month" after execution of the TAA.  (Dkt. No. 17, Attach. 10 at 3-4.)  By letter, in September 2007, Erie notified Winfield that it was terminating the TAA effective December 4, 2007.  (*See* Def.'s SMF ¶¶ 35-40; Dkt. No. 17, Attach. 12 at 1.)

On September 26, 2007, Erie sent "offer letters" to policyholders being serviced by Winfield, which explained "that the agency relationship between Winfield and Erie had been terminated" and contained other information—relevant to the individual policyholders' options in light of Erie's termination of the TAA—that is at the center of this action.  (Def.'s SMF ¶ 42.)  In pertinent part, the letters, which existed in three iterations for personal lines, automobile, and commercial lines policies, explained that Winfield had been terminated as an agent, the policyholder was entitled to continue the policy through Winfield, and Erie would non-renew the policy at the appropriate time.  (*See* Dkt. No. 17, Attachs. 13-15.)  As for personal lines and automobile policies, if no action was taken, the policy would be serviced by Erie directly, and the policyholder was given only three weeks to express his or her intention.  (*See* Dkt. No. 17, Attachs. 13-

4

14.)  The letter sent to commercial lines policyholders did not require any affirmative action on their part to remain with Winfield.  (*See* Dkt. No. 17, Attach. 15.)  All three letters also encouraged the policyholder—in bold and mostly capitalized text—to contact Winfield to inquire about his or her policy and potentially "**ARRANGE FOR REPLACEMENT COVERAGE WITH ANOTHER COMPANY**."  (Dkt. No. 17, Attachs. 13-15.)

Winfield sent out its own letters afterward, and therein attempted to explain the Erie offer letters to the policyholders in an effort to retain their business.  (*See* Def.'s SMF ¶¶ 51-53.)  Consistent with Erie's offer letters, some policyholders elected to continue with Winfield during the statutory run-off period and Erie paid commissions to Winfield until the policies were non-renewed.  (*See id.* ¶ 54.)  Erie also permitted Winfield to service the policies after it objected to the offer letters even if an individual policyholder did not indicate his or her intention to remain with Winfield by returning a signed letter.  (*See id.* ¶ 55.)  Only policyholders that specifically requested a new agent from Erie were provided information about how to obtain an Erie-approved agent, and, even then, Erie would merely refer the policyholder to the website that listed Erie agents, or provide the names and telephone numbers of such agents to the inquiring policyholder.  (*See*

5

*id.* ¶¶ 56-59.)  Ultimately, Winfield only retained approximately thirteen percent of the expirations, far less than the eighty to eighty-five percent that Tomassi hoped for.  (*See* Dkt. No. 21, Attach. 11 ¶ 26; Pl.'s SMF ¶ 11.)

**B.     Procedural History**

Winfield commenced this action on December 21, 2010 alleging claims of conversion, tortious interference with business relationships, and a violation of N.Y. Gen. Bus. Law § 349.  (*See* Compl. ¶¶ 34-44.)  Following joinder of issue, (*see* Dkt. No. 8), and discovery, (*see, e.g.*, Dkt. No. 17, Attachs. 4-5, 17, 20-22; Dkt. No. 21, Attachs. 5, 8-9), Erie moved for summary judgment, (*see* Dkt. No. 17), and Winfield cross-moved for partial summary judgment, (*see* Dkt. No. 21).  Winfield has withdrawn its cause of action pertaining to N.Y. Gen. Bus. Law § 349.  (*See* Dkt. No. 21, Attach. 15 at 4.)

### III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV. **Discussion**[2]

Erie contends that it is entitled to summary judgment on all claims primarily because the offer letters it mailed to policyholders whose policies were being serviced by Winfield after its buyout of Farley were required by N.Y. Ins. Law §§ 3425(j)(1)(A), (B) and 3426(k)(1) (McKinney 2007). (*See* Dkt. No. 17, Attach. 27 at 9-15.) In particular, Erie argues that, upon its termination of the TAA, it was obligated by law to send offer letters to the policyholders. (*See id.* at 10-15.) Further, Erie claims that, notwithstanding its obligation to communicate with policyholders, no claim of conversion lies here because the property at issue—the expirations—is intangible and not subject to conversion, and the facts simply do not support that any conversion took place. (*See id.* at 15-18; Dkt. No. 24, Attach. 5 at 12-19.) Finally, Erie alleges that Winfield's tortious interference with business relationships claim fails as a matter of law because the only contact by Erie with the policholders was required by §§ 3425(j)(1)(A), (B) and 3426(k)(1), and, among other things, Erie's contact with them was not "wrongful" or "solely malicious." (Dkt. No.17, Attach. 27 at 18-21; *see* Dkt. No. 24,

---

[2] The parties apparently agree, as demonstrated by their reliance on New York decisional and statutory law, that New York law is applicable to this diversity action; the court agrees.

7

Attach. 5 at 19-22.)

Winfield claims that it is entitled to summary judgment on the issue of liability.  (*See* Dkt. No. 21, Attach. 15 at 5-22.)  In support, Winfield argues that the offer letters sent by Erie to the policyholders "were not required by the New York State Insurance Law and were nothing more than marketing letters sent out by Erie to get an upper hand in the battle between Winfield and Erie for the customers making up the Farley book of business."  (*Id.* at 3, 10-15.)  As for its specific causes of action, Winfield contends that an agency's book of business, or expirations, is its tangible, saleable property, and that Erie's contact with the policyholders constituted conversion of its expirations and tortious interference with business relations.  (*See id.* at 5-9, 16-19, 20-22.)  Although the court disagrees with Erie that its offer letters are wholly excusable, it agrees that claims of conversion and tortious interference are unavailable in this case.

**A.** **Erie's Offer Letters**

Pursuant to sections 3425 and 3426 of the New York Insurance Law, upon the termination of an agent, an insurer must offer to the insured the opportunity to continue the policy for any remaining part of the required policy period and, under some circumstances, for additional periods of time

8

with respect to personal lines and automobile insurance, through the terminated agent.  *See* N.Y. Ins. Law §§ 3425(j)(1)(A) & (B); 3426(k)(1).  The exact parameters of such an offer are not clear.  For example, while the agency responsible for supervising and regulating insurance business within New York has generated various opinions and documents, (*see generally* Dkt. No. 17, Attach. 28; Dkt. 21, Attach. 6; Dkt. 24, Attach. 8), directing that "[t]he letter from the insurer should be sent at the time of the termination," (Dkt. No. 17, Attach. 28 at 9), and it is inherent in the statutes and the agency's opinions that the insured should be informed of the termination itself, there is nothing in the statutes that: (1) specifically permits the insurer to place upon the insured the obligation to take some affirmative act to retain the terminated agent; (2) to advise the insured that it intends to non-renew a particular policy in advance of the time frames set out in N.Y. Ins. Law §§ 3425(d)(1) and 3426(e); or (3) require the insured to express his or her intention about continuing with the terminated agent within any particular time frame.  Thus, the content and form of Erie's letters cannot be explained away as entirely harmless simply by referring to sections 3425(j)(1)(A), (B) and 3426(k)(1).  In any event, Erie is entitled to summary judgment on Winfield's remaining claims of conversion and

tortious interference for the reasons that follow.

## B.     Conversion of Expirations

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006).  The elements of the tort, therefore, are that: (1) the plaintiff has a "possessory right or interest in the property"; and (2) that the defendant takes dominion over the property or interferes with it in derogation of the plaintiff's rights. *Id.* at 50.  Importantly, here, however, "'an action for conversion will not normally lie, when it involves intangible property' because there is no physical item that can be misappropriated." *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 289 (2007) (quoting *Sporn v. MCA Records*, 58 N.Y.2d 482, 489 (1983)).

While Winfiled contends that the expirations are *tangible* property, it provides no cogent support for that proposition.  (*See* Dkt. No. 21, Attach. 15 at 5-9.)  In contrast, one of the cases that Winfield relies on clearly identifies expirations as *intangible* assets, *see Barrow v. Lawrence United Corp.*, 146 A.D.2d 15, 19 (3d Dep't 1989); (Dkt. No. 21, Attach. 15 at 6),

10

while the others only support the proposition that expirations are a valuable or "major asset" in the insurance industry. *Gotchis v. Allstate Ins. Co.*, Civ. A. No. 90-12553-Y, 1993 WL 795440, at *2 (D. Mass. Feb. 19, 1993); *see In re Williams*, 354 B.R. 604, 608-09 (Bankr. N.D.N.Y. 2006); *Clarion Assocs., Inc v. Colby Co.*, 276 A.D.2d 461, 461-63 (2d Dep't 2000); *Richard T. Blake & Assocs.*, 255 A.D.2d at 570-71; *World Wide Specialty Programs, Inc. v. Lexington Ins. Co.*, 2012 N.Y. Slip. Op. 30638U, at *2 (Sup. Ct. Mar. 13, 2012). While it is uncontested that Winfield owned the expirations, (*see* Dkt. No. 17, Attach. 10 at 1), because they are intangible property, a claim of conversion does not lie here. *See Sun Gold, Corp. v. Stillman*, 95 A.D.3d 668, 670 (3d Dep't 2012) ("The conversion of intangible property is not actionable.").

**C.    Tortious Interference With Prospective Economic Relations**

To establish a claim of tortious interference, "a plaintiff must plead that the defendant directly interfered with a third party and that the defendant either employed wrongful means or acted 'for the sole purpose of inflicting intentional harm on plaintiff[].'" *Posner v. Lewis*, 18 N.Y.3d 566, 570 n.2 (2012) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)). "Wrongful means include physical violence, fraud or

11

misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Carvel Corp.*, 3 N.Y.3d at 191 (internal quotation marks and citation omitted). A violation of the duty of fidelity owed to the plaintiff "by reason of a relation of confidence existing between them" can also serve as wrongful means. *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194 (1980). Further, where the motive for a defendant's interference with a prospective economic relationship is "normal economic self-interest," the plaintiff is unable to show that the defendant acted solely to harm it. *Carvel Corp.*, 3 N.Y.3d at 190.

Here, Winfield does not, and cannot, argue that Erie's interference was solely for the purpose of inflicting harm to it.[3] Instead, Winfield contends that Erie used wrongful means to deprive Winfield of the opportunity to retain the policyholders. (*See* Dkt. No. 21, Attach. 15 at 20-

---

[3] Indeed, Winfield alleges in its Complaint that Erie's interference involved wrongful encouragement of policyholders to permit Erie to directly service their policies rather than remain Winfield's clients. (*See* Compl. ¶ 38.) Inherent in that allegation is Erie's economic self-interest, which would demonstrate that its purpose was not solely to inflict harm to Winfield.

12

22.)  In particular, Winfield claims that Erie's interference with its ability to solicit renewals "was wrongful in itself" and "constituted the tort of conversion," and Erie's conduct violated the TAA, which gave rise to a duty of fidelity preventing it from taking any action in derogation of Winfield's rights.  (*Id.* at 22.)  Persuasion alone, however, is insufficient and, because the expirations are intangible, a claim of conversion is unavailable.  With respect to Winfield's contention that Erie acted by wrongful means because it violated a duty of fidelity, the court does not agree.  While little case law speaks to this issue, Erie owed no duty of fidelity to Winfield by reason of a relation of confidence, and, thus, Winfield's argument fails in that regard as well.  *See, e.g.*, *Hayes v. Case-Hoyt Corp.*, 262 A.D.2d 1018, 1018 (4th Dep't 1999) (explaining that employees owe employers a duty of fidelity by virtue of relation of confidence); *ENV Servs, Inc. v. Alesia*, 10 Misc.3d 1054(A) (N.Y. Sup. Ct. 2005) (describing "relation[s] of confidence" as existing between key employees of a corporation or a manufacturer and distributor).  Moreover, as discussed above, it is not even clear if Erie's communication with the policyholders amounts to non-sanctioned interference; indeed, *some* communication was mandated by New York law.

13

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Erie's motion for summary judgment (Dkt. No. 17) is **GRANTED**; and it is further

**ORDERED** that Winfield's cross motion for partial summary judgment (Dkt. No. 21) is **DENIED**; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the clerk close this case; and it is further

**ORDERED** that the clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

October 12, 2012
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
Chief Judge
U.S. District Court